# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

vs.                                                            Case No.: 3:15-cr-45-J-34MCR

DARYL THORNTON SHINGLES
_____/

## REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on Defendant's Motion to Suppress Physical Evidence and Statements (the "Motion") (Doc. 18), and the Government's response (the "Response") in opposition to the Motion (Doc. 25). An evidentiary hearing was held before the undersigned on May 27, 2015.

## I.    Background

On April 2, 2014, the grand jury returned a one-count indictment against Defendant charging him with unlawful possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g).  (Doc. 1.)  On May 5, 2015, Defendant filed the instant Motion seeking to suppress any evidence seized on June 21, 2014, from room 118 of the Eagle Inn ("Room 118"), as well as any statements made by Defendant that the Government intends to introduce at trial.  (Doc. 18.)

---

[1] "Within 14 days after being served with a copy of [this Report and Recommendation], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Crim. P. 59(b)(2); *see also* 28 U.S.C. § 636(b)(1); M.D. Fla. R. 6.02(a).  "A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).

On May 8, 2015, the Court granted Defendant's unopposed motion to continue

the status conference and trial in this matter.  (Doc. 24.)  The status conference is

set for June 22, 2015 and the trial is set for the trial term commencing on July 6,

2015.  (Doc. 24.)

## II.    Evidence Presented at the Hearing

During the evidentiary hearing, the Government presented the testimony of

Detective Charles Bennett ("Detective Bennett"), who is employed with the

Jacksonville Sheriff's Office ("JSO"), and Detective Cedric Arline ("Detective

Arline"), who is employed with the Nassau County Sheriff's Office ("NCSO"), both

of whom participated in a human trafficking investigation on June 21, 2014, which

lead to the arrest of Defendant.  The Government also entered fourteen (14)

exhibits into evidence, including various photographs of Room 118, a property

storage card identifying the seized evidence, and a case item history report

describing the seized evidence.  Defendant testified at the evidentiary hearing,

and presented the testimony of Sergeant Jonathan LaDue ("Sgt. LaDue") with

JSO.  Defendant entered one composite exhibit into evidence, which consisted of

photographs of the evidence seized from Room 118.[2]  The undersigned

summarizes some of the relevant testimony below to provide factual context to

---

[2] The undersigned refers to the Government's exhibits as "Govt. Ex. __" and Defendant's exhibits as "Def. Ex. __."

this Report and Recommendation.[3]

### A.    Detective Charles Bennett's Testimony

Detective Bennett has been employed with JSO for over twenty (20) years. (Tr. 7.)  Detective Bennett, a certified law enforcement officer working primarily in narcotics, attended various narcotics training courses during his tenure at JSO. (Tr. 7-8.)  Detective Bennett is also co-owner of a training company called S.W.A.N. Tactical, where he "travels around the United States teaching narcotics and tactics and hotel interdiction."  (Tr. 7.)  The training at S.W.A.N. Tactical includes training on Fourth Amendment issues regarding searches and seizures. *Id.*

Detective Bennett testified that on the evening of June 21, 2014, he was assisting with a nationwide human trafficking operation in conjunction with the FBI called Operation Cross Country.  (Tr. 8.)  Operation Cross Country placed an emphasis on rescuing victims of juvenile sex trafficking.  (Tr. 9.)  On that evening, Detective Bennett worked with Detectives Cedric Arline and Brian Blackwell of NCSO as part of a takedown team within the operation.  (*Id.*)  During the evening, Detectives Bennett, Arline, and Blackwell rode together in an undercover vehicle and waited for the vice detective to give them further direction.  (*Id.*)  Detective Bennett was familiar with the area of Philips Highway, north of Emerson Street,

---

[3] Defendant also presented testimony of officer David Gaston and detective Bradley Hurst of JSO, as well as testimony of investigator Leslie Calajo of the Federal Defender's Office, Jacksonville division.

as being a high-narcotics, high-prostitution area.  (Tr. 10-11.)  Detective Bennett

personally conducted numerous narcotics arrests and searches, and "bought

drugs out of every hotel on Philips Highway north of Emerson."  (Tr. 11.)

    At around 11:00 p.m. or 11:30 p.m. on June 21, 2014, Detective Bennett

interacted with Sgt. LaDue of JSO, the lead sergeant of the hotels and apartment

task force for the zone in which Detective Bennett was working.  (Tr. 11-12.)  At

that time, Detective Bennett drove to Sgt. LaDue's location and observed Sgt.

LaDue talking to two females.  (*Id.*)  Sgt. LaDue then instructed Detective Bennett

to go to Room 118 of the Eagle Inn because "[t]here's a 15-year-old girl prostitute

down there."  (Tr. 12, Govt. Ex. 1.)  According to Sgt. LaDue, who obtained the

information from other law enforcement officers working on the case, the juvenile

trafficking victim was known by the nickname "Pinky," and was potentially with an

older woman nicknamed "Precious."  (Tr. 12-13, 77.)

    Detective Bennett knew from his experience that the Eagle Inn was known

for narcotics and prostitution.  (Tr. 16.)  After receiving the information from Sgt.

LaDue, Detectives Bennett, Arline, and Blackwell proceeded to the hotel.  (Tr.

12.)  Upon arriving at the hotel, Detective Bennett led the NCSO detectives to the

door.  (Tr. 15.)  As Detective Bennett approached the door, he noticed the door to

Room 118 unlatched and ajar, "about an inch – to two inches."  (Tr. 14.)

Detective Bennett heard two male voices coming from inside the room.  (Tr. 15,

22, 28.)  At that point, Detective Bennett knew he was dealing with multiple

occupants.  (Tr. 22.)  Detective Bennett used his right hand to knock twice on the

door with a "heavy knock" and stated "Police" in a tone somewhere between

conversational and yelling.  (Tr. 20-22.)  Because the door was slightly ajar, the

door opened from about one inch to "probably half a foot on the first knock."  (Tr.

22.)  After Detective Bennett's second knock, the door "opened probably another

six inches to a foot."  *Ia.*  At that time, Detective Bennett saw a table at the edge

of the doorway.  (Tr. 23.)  On the table, Detective Bennett observed in plain view

a beaker turned upside down on the table.  (Tr. 23.)  Based on Detective

Bennett's training with narcotics, he observed what appeared to him to be crack

cocaine "cooling" inside of a beaker.  (Tr. 23, 36, 37, 56, Govt. Ex. 8-9.)

Detective Bennett then used his left hand to push the door to Room 118

completely open.  (Tr. 23.)  From his position outside the hotel room, Detective

Bennett observed a man sitting on a chair at the end of a credenza located

closest to the bathroom doorway and in close proximity to the beaker observed in

plain view.  (Tr. 22-24, 36-38, Govt. Ex. 8-10.)  He later learned that Clessie Riles

was the man in the chair.  (Tr. 26.)   Detective Bennett also noticed Defendant

sitting on the floor next to the bed and a female sitting on the bed.  (Tr. 23-25, 36,

Govt. Ex. 9.)

Detective Bennett, along with Detectives Arline and Blackwell then entered

the room.  (Tr. 25, 29.)  Detective Bennett ordered Mr. Riles, who was closest to

the door, to stand up.  (Tr. 24-25.)  Detectives Arline and Blackwell ordered

Defendant to stand up, whereupon a firearm was observed where Defendant was sitting.  (Tr. 29-30.)  Detective Bennett observed Defendant immediately break out into "a visible sweat" and enter into a pattern of labored breathing.  (Tr. 32-33.)  Defendant was placed in handcuffs, arrested, and escorted to the back of a patrol vehicle where he was given *Miranda* warnings.  (Tr. 31-33.)

After detaining Mr. Riles, Detective Bennett went into the bathroom and found a female, Shalya Jones, sitting on the toilet.  (Tr. 27-28, 40-42. Govt. Ex. 11-12.)  Detective Bennett noticed drug paraphernalia in the toilet bowl as he ordered Ms. Jones to stand up.  (Tr. 41.)  Detective Bennett believed Ms. Jones was in the process of attempting to discard the drug paraphernalia.  (Tr. 27-28, 31.)  Detective Bennett then directed another patrolman to collect the evidence in Room 118, including an automatic pistol, drugs, two beakers containing drug residue, and other drug paraphernalia.  (Tr. 33, 47-49, Govt. Ex. 13-14.)

### B.    Detective Cedric Arline's Testimony

Detective Arline, a state certified vice and narcotics detective who has been employed with NCSO for approximately fifteen (15) years, was one of the two detectives working Operation Cross Country with Detective Bennett on June 21, 2014.  (Tr.  58-62.)  Detective Arline testified regarding his extensive training and experience as a vice and narcotics detective, and his knowledge of the Philips Highway area, north of Emerson Street, as a "hotbed for prostitution activities."  (Tr. 59-61.)

6

On the evening of June 21, 2014, Sgt. LaDue told Detectives Arline, Bennett, and Blackwell that a fifteen (15) year-old female who goes by the nickname Pinky was in Room 118 of the Eagle Inn.  (Tr. 62-63.)  Based on the intelligence received, Detectives Bennett, Arline, and Blackwell drove to the Eagle Inn.  (Tr. 63.)

Approaching the door with Detective Bennett, Detective Arline could see that the door to Room 118 was ajar and could hear male and female voices coming from Room 118.  (Tr. 63, 68.)  According to Detective Arline, Detective Bennett knocked on the door twice and announced his presence.  (Tr. 64, 70.)  At that point, the door opened further and it appeared to him that the door was being pushed closed.  (Tr. 64-65.)  Detective Arline was able to "peer off inside of the room," and he could see "drugs in plain sight," both "on the counter next to the door opening [] and then on the nightstand . . ."  (Tr. 65.)  Detective Arline explained further that he saw what appeared to be crack cocaine drying inside a beaker that was turned upside down on a table.  (Tr. 72.)  Upon viewing the drugs, Detective Arline entered the room with Detective Bennett.  (Tr. 65-66.)

At that point, Detective Arline saw Defendant sitting on a stool next to the bed.  (Tr. 66-67.)  Defendant was ordered to stand up.  (Tr. 67.)  Detective Arline observed Defendant "sweating profusely" when he was ordered to stand up.  (*Ia.*)  Detective Arline observed a small automatic firearm underneath the area Defendant was sitting.  (Tr. 68.)  Defendant was placed in handcuffs and taken

7

out of Room 118.  (Tr. 67.)  Detective Arline testified he then assisted Detective

Bennett with the other individuals in Room 118.  (*Id.*)

### C.   Sgt. Jonathan LaDue's Testimony

Sgt. LaDue testified he has been employed with JSO for twenty-one (21)

years.  (Tr. 75.)  On June 21, 2014, Sgt. LaDue was a supervisor of a team of

officers participating in Operation Cross Country.  (Tr. 76.)  Sgt. LaDue relayed

what he considered credible information to Detective Bennett about a juvenile

referred to as "Pinky" that was supposedly at Room 118.  (Tr. 86, 88.)  Based on

Sgt. LaDue's prior experience and training, he knew the Eagle Inn to be a well-

known area for prostitution, narcotics and firearms.  (Tr. 86.)  Sgt. LaDue

personally was involved in more than 1500 contacts with prostitutes within a

quarter mile of the Eagle Inn.  (*Id.*)

After receiving the information, Sgt. LaDue ordered Detective Bennett to go

directly to Room 118.  (*Id.*)  Sgt. LaDue arrived at Room 118 approximately ten

(10) minutes after he directed Detective Bennett to the hotel.  (Tr. 78.)  Upon

entry, Sgt. LaDue observed crack cocaine in a "baggy" on the table by the

doorway to the room.  (Tr. 81.)  Sgt. LaDue did not recall seeing a beaker upon

his later arrival.  (Tr. 79, 81-82.)

Sgt. LaDue interviewed certain occupants of Room 118, including a woman

referred to as "Precious" and Defendant.  (Tr. 86-88, 90-91.)  The woman referred

to as "Precious" relayed to Sgt. LaDue that the juvenile trafficking victim had been

taken away to another state by her "handlers."  (Tr. 87.)  Sgt. LaDue then

interviewed Defendant after reading him his *Miranda* warnings.  (Tr. 90.)

### D.  Defendant's Testimony

Defendant testified that he rented Room 118 under his name.  (Tr. 103.)  At

approximately 11:00 p.m. on June 21, 2014, police officers opened the unlatched

door and entered Room 118, causing the door to hit Mr. Riles who was sitting

near the doorway.  (Tr. 101-03, 105.)  Defendant stated that the officers entered

Room 118 without knocking or without announcing their presence, and without

consent.  (Tr. 103.)  Defendant also testified that no beaker was present on the

table next to the doorway to Room118, no crack cocaine was in plain view within

the room, and no scale that he knew of was present within the room.  Defendant

further stated that he has no idea whether a whisk was present inside the room

although the hotel room was registered in his name.  (Tr. 107-08.)  Defendant

admitted, however, that there was cocaine inside a drawer.  (Tr. 108.)  Defendant

also admitted that he has twenty-one (21) prior felony convictions.  (Tr. 110.)

### E.  Credibility

It is the district court's function to evaluate the credibility of witnesses when

ruling on a motion to suppress evidence.  *See, e.g., United States v. Castro*, 723

F. 2d 1527, 1533 (11th Cir. 1984) (indicating that the district court assesses the

credibility of witnesses when determining a motion to suppress); *Brown v. Sec.,*

*Dep't. of Corrs.*, Case No. 8:01-cv-2374-T-23TGW, 2009 WL 4349320, *17 (M.D.

Fla. Nov. 25, 2009) ("[Q]uestions relating to evidentiary weight and credibility of witnesses are reserved to the trial court") (citations omitted).  Here, there is a direct contradiction between Defendant's and the law enforcement officers' testimony regarding the circumstances surrounding Defendant's arrest, and the way in which the challenged evidence was seized.  The undersigned rejects the testimony of Defendant regarding these events as not credible.

For example, Defendant's awareness of drugs contained inside a drawer in Room 118 is inconsistent with his alleged lack of awareness of other drugs and drug paraphernalia seized as evidence within the room, which was admittedly registered in Defendant's name.  (Tr. 107-08.)  Further, Defendant's testimony in this regard is belied by the physical evidence obtained from Room 118.  (Govt. Ex. 13-14.)  Defendant's credibility is also questionable in that he has twenty-one (21) felony convictions at thirty-five (35) years of age and that the disposition of the charge in this case may largely depend on the disposition of the present motion.  (Tr. 110-11.)

Moreover, Detectives Bennett and Arline independently and consistently testified in a detailed manner regarding the intelligence they learned with respect to the juvenile in Room 118.  Detectives Bennett and Arline also consistently testified regarding the reputation of the Eagle Inn, the approach to Room 118, and the events surrounding the entry, detention, and eventual arrest of Defendant.  Under a common-sense view of the totality of the circumstances, the

10

version of events offered by the law enforcement officers is more credible.

At the hearing, Defendant's attorney attempted to impeach Detective Bennett's credibility by showing that he and Detective Arline did not actually observe a beaker containing crack cocaine in plain view.  Defendant presented evidence that JSO seized a total of only two beakers as evidence.  (Tr. 115, Def. Ex. 1, Govt. Ex. 13-14.)  Defendant also reminded Detective Bennett of his prior statement at his August 28, 2014 deposition that "[t]here were beakers [in the toilet] and [Ms. Jones] was trying to destroy evidence."  (Tr. 51.)  Defendant argues that Detective Bennett's use of the plural form of the word beaker in his prior statement in conjunction with the actual evidence seized by JSO indicates that JSO seized a total of two beakers in the toilet, and did not seize a beaker in plain view on the table next to the doorway in Room 118.  (Tr. 112-15, 132-33, Def. Ex. 1.)  Defendant attempts to substantiate this contention by presenting evidence from Sgt. LaDue that he did not recall seeing a beaker in plain view when he arrived at the scene.  (Tr. 81-82.)

The undersigned finds the testimony of Detectives Bennett and Arline regarding the beaker located on the table in plain view to be credible.  As Detective Bennett explained at the hearing, he does not recall how many beakers were in the toilet and that it is possible that he was getting the number of total beakers confused.  (Tr. 47, 49, 50.)  Detective Bennett testified that he knew that JSO recovered a beaker from the table and a beaker from the toilet.  (Tr. 47-49;

11

Govt. Ex. 13-14.)  The description of items 7 and 8 on the case item history report

supports Detective Bennett's testimony.  (Govt. Ex. 14.)  The undersigned finds

the foregoing explanation by Detective Bennett to be credible.  Further, Detective

Arline independently testified that he saw the beaker on the table in plain view.

(Tr. 64-65, 72.)  Finally, the fact that Sgt. LaDue does not recall seeing a beaker,

after having arrived at the scene after the fact, in no way implies that there was

no beaker on the table.

## III.  Analysis

Defendant seeks to suppress all evidence seized during the search of

Room 118 on June 21, 2014, as well as all statements he made to law

enforcement officers while being detained.  Defendant argues law enforcement

officers illegally entered Room 118 in violation of the Fourth Amendment.

Specifically, Defendant argues that the law enforcement officers forced their way

into Room 118 without a warrant and without probable cause and exigent

circumstances to do so.

The Government responds that the law enforcement officers had probable

cause and exigent circumstances to conduct a warrantless search of Room 118

and to seize the evidence in plain view, including the gun that is the subject of

Defendant's charge.

### A.    The Warrantless Entry Into Room 118

"It is a 'basic principle of Fourth Amendment law' that searches and

seizures inside a home without a warrant are presumptively unreasonable."
*United States v. Burgos*, 720 F. 2d 1520, 1525 (11th Cir. 1983) (citing *Payton v.
New York*, 445 U.S. 573, 586 (1980)).  "[A] motel room, however temporary, is
equivalent to one's home."  *United States v. Forker*, 928, F.2d 365, 370 (11th Cir.
1991).  Because the Government did not have a warrant and did not obtain
consent to enter into Room 118, the Government bears the burden of proving an
exception to the warrant requirement exists.  For the reasons set forth below, the
undersigned concludes that probable cause and exigent circumstances existed to
justify the warrantless search of Room 118.

### i.    Probable Cause

"Probable cause exists when under the 'totality-of-the-circumstances . . .
there is a fair probability that contraband or evidence of a crime will be found in a
particular place.'" *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991)
(quotations omitted).  In deciding whether probable cause exists, the court may
examine "'the facts and circumstances within the collective knowledge of law
enforcement officials, [who] had reasonably trustworthy information.'"  *United
States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985) (quoting *United States v.
Blasco*, 702 F.2d 1315, 1324 (11th Cir. 1983)).  In other words, probable cause
exists "where the facts lead a reasonably cautious person to believe that the
'search will uncover evidence of a crime.'"  *Burgos*, 720 F.2d at 1525 (quoting
*United States v. Rojas*, 671 F.2d 159, 165 (5th Cir. Unit B 1982)).

The undersigned finds that probable cause existed to enter the room at the time Detectives Bennett and Arline saw the beaker containing crack cocaine in plain view on the table.  Detectives Bennett and Arline received specific information regarding a potential juvenile trafficking victim inside Room 118. Based on this information and their personal knowledge of Eagles Inn's reputation as a motel known for drugs and prostitution, the detectives proceeded to Room 118.  Upon arriving at the Eagle Inn, Detectives Bennett and Arline observed the door to Room 118 as being slightly ajar and heard mixed, male and female voices coming from inside the room.

Based on these circumstances, the undersigned finds that Detectives Bennett and Arline were justified in approaching Room 118 in an attempt to investigate and question the occupants regarding a juvenile trafficking victim potentially located inside the room.  *See, e.g., United States v. Smalls*, 617 F. Supp. 2d 1240, 1252 (S.D. Fla 2008) ("It is well-settled that the police may approach a residence and knock on the door for any legitimate reason") (citing *United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006)); *Tobin*, 923 F.2d at 1511 (stating that the officers were justified in approaching a house to question the occupants based on the circumstances known to the officers); *see also People v. Holmes*, 981 P.2d 168, 171 (Colo. 1999) (holding that police knocking on unlatched door to apartment causing door to inadvertently open does not constitute an unlawful warrantless search).  The undersigned also finds that when

14

Detectives Bennett and Arline observed the beaker containing crack cocaine in plain view after the second knock, they had a reasonable belief that a search of Room 118 would uncover evidence of a crime.  *Tobin*, 923 F.2d at 510; *Burgos*, 720 F.2d at 1525; *Borum v. United States*, 318 A.2d 590, 592 (D.C. Cir. 1974) ("The narcotics paraphernalia which was observed through the opening in the door [of the hotel room] was within the officers' plain view, and was seen from a place where *they not only had a right to be*, but where they were invited to be by the hotel's owner") (emphasis added).

### ii.   Exigent Circumstances

The exigent circumstances exception to the warrant requirement only applies when "the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action."  *Burgos*, 720 F.2d at 1526.  "Exigent circumstances that have been recognized include: danger of flight or escape; danger of harm to police officers or the general public; risk of loss, destruction, removal, or concealment of evidence; and 'hot pursuit' of a fleeing suspect."  *United States v. Blasco*, 702 F.2d 1315, 1325 (11th Cir. 1983).

Regarding destruction of evidence, the Eleventh Circuit has determined "the need to invoke the exigent circumstances exception to the warrant requirement is 'particularly compelling in narcotics cases' because narcotics can be so quickly destroyed."  *Tobin*, 923 F.2d at 1510.  "The mere presence of contraband, however, does not give rise to exigent circumstances." *United States*

15

*v. Lynch*, 934 F.2d 1226, 1232 (11th Cir. 1991).  Rather, "the appropriate inquiry

is whether the facts . . . would lead a reasonable, experienced [officer] to believe

that evidence might be destroyed before a warrant could be secured."  *Tobin*, 923

F.2d at 1510.  The Government bears the burden of proving that its law

enforcement officers had an objectively reasonable belief that exigent

circumstances existed at the time of their warrantless entry into a dwelling.

*United States v. Tovar-Rico*, 61 F.3d 1529, 1535 (11th Cir. 1995) (citing *Coolidge*

*v. New Hampshire*, 403 U.S. 443, 455, 91 S.Ct. 2022, 2032 (1971)).  However,

"exigent circumstances will not justify warrantless entry if the exigency was

created by those conducting the search."  *United States v. McGregor*, 31 F.3d

1067, 1069 (11th Cir. 1994).

Here, the undersigned finds that when Detectives Bennett and Arline saw

the beaker in plain view through the partially opened door containing what they

believed to be "cooling" crack cocaine, they had a reasonable basis to believe

that the drugs and drug paraphernalia might be destroyed before a warrant could

be secured.  *See, e.g., Hardy v. Broward Cnty. Sheriff's Office*, 238 F. App'x 435,

441-42 (11th Cir. 2007) (holding that exigent circumstances existed to enter an

apartment where officers smelled burnt cannabis emanating from a partially open

door because, had the officers delayed entering the apartment, they risked the

"loss, destruction, removal, or concealment of evidence"); *Tobin*, 923 F.2d at

1510 (holding that exigent circumstances existed to enter a house where officers

16

detected the odor of marijuana as the door stood open because "the defendants and anyone else who might have been present in the house would have been aware of the agent's suspicions at that moment").  Ms. Jones' attempt to conceal or dispose of evidence in the toilet highlights the reality of the risk of delay in entering the room.  The undersigned finds that the officers were justified in entering Room 118 based on the exigency of risk of destruction of evidence.

The potential need to assist a minor at risk for sexual exploitation provided an additional exigency to enter the room.  *See, e.g., United States v. Kenfield*, 270 F. App'x 695, 696-97 (9th Cir. 2008) (upholding warrantless search of trailer home because officers had a reasonable basis for concluding there was an immediate need to protect a minor female from sexual assault); *United States v. Williams*, Case No. 12-CR-6152-FPG, 2015 WL 3454430, *4 (W.D.N.Y. May 29, 2015) (upholding warrantless search of apartment due to officers' reasonable belief that it was necessary to enter to protect a minor from prostitution against her will); *United States v. Thomas,* Case No. 3:14-CR-31(RNC), 2015 WL 164075, *4 (D. Conn. Jan. 13, 2015) ("The need to protect a dwelling's occupant from imminent injury is an exigency justifying entry into the dwelling, and the defendant concedes that 'the potential sexual exploitation of a minor is an exigent circumstance'") (citations omitted); *United States v. Gilliam*, Case No. 11 Crim. 1083, 2012 WL 4044632, *2 (S.D.N.Y. Sept. 12, 2012) ("It has been sensibly held that the potential exploitation of a minor is an exigent circumstance") (citations

17

omitted); *United States v. King*, 560 F. Supp. 2d 906, 916 (N.D. Cal. 2008) (recognizing that the exigent circumstances exception extends to situations where a minor is at risk of sexual contact).

Defendant did not contest the validity of the specific information that the detectives received regarding the potential at-risk juvenile.  Armed with the information that a fifteen (15) year-old female known as "Pinky" may be the victim of sex trafficking in Room 118, as well as knowledge of the hotel's reputation, Detectives Bennett and Arline approached a slightly opened hotel door, hearing mixed male and female voices inside the room.  The undersigned finds that it was objectively reasonable for the detectives to believe there was an urgent need to investigate, knock, and enter a hotel room to potentially retrieve a minor at risk for sexual exploitation or trafficking.  *See, e.g., Kenfield*, 270 F. App'x at 697 ("[The officer] reasonably believed that he had to act quickly to retrieve the juvenile. Indeed, '[t]his is a case where the police would be harshly criticized had they not investigated'") (citations omitted); *Williams*, 2015 WL 3454430 at *4 ("Here, police possessed information sufficient to support their reasonable belief that [the at-risk minor] was a person in need of emergency aid and that she could be located in the apartment at 204 Caroline Street"); *see also Holloway*, 290 F.3d 1331, 1338 (11th Cir. 2002) (upholding warrantless search of home for potential victims of gunfire based on officers' reasonable belief of the emergency situation).

**B.    Detention and Seizure of Evidence**

Once lawfully inside of Room 118, and upon seeing the drugs in plain view,

the detectives were authorized to secure Defendant's arrest based on perceived illegal drug activity. *See, e.g., Wood v. Kesler*, 323 F.3d 872, 878 (11th Cir. 2003) ("Th[e] [probable cause to arrest] standard is met when the facts and circumstances within the officer's knowledge . . . would cause a prudent person to believe . . . that the suspect has committed, is committing, or is about to commit an offense"). When Defendant was ordered to stand up, the detectives saw the gun in plain view located underneath where Defendant was sitting. The detectives properly seized the gun at that point, as well as the drugs and drug contraband in plain view. *See, e.g., Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971) ("Where the initial intrusion that brings the police within the plain view of such an article is supported, not by warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate"); *Tobin*, 923 F.2d at 1513 (holding that drugs and drug paraphernalia in plain view were properly seized after lawful warrantless entry into house); *see also United States v. Terzado-Madruga*, 897 F.2d 1099, 1120 (11th Cir. 1990) ("It is uniformly recognized that weapons are often as much 'tools of the trade' as most commonly recognized narcotics paraphernalia"); *United States v. Cruz*, 805 F.2d 1464, 1474 (11th Cir. 1986) ("Of course, numerous cases have recognized that guns are a tool of the drug trade. There is a frequent and overpowering connection between the use of firearms and narcotics traffic").

Further, the law enforcement officers also properly seized the other drugs and contraband located within Room 118 as a search incident to Defendant's

lawful arrest.  *See, e.g., Chimel v. California*, 395 U.S. 714, 763 (1969) (holding that when conducting such search, officers may search "the arrestee's person and the area within his immediate control"); *United States v. Jones*, 218 F. App'x 916, 918-19 (11th Cir. 2007) (holding that search in hotel room incident to arrest was lawful even though defendant was restrained and recognizing that such searches are valid because of the "'need to remove any weapons that the arrestee might see to use in order to resist arrest or effect his escape' and the need to prevent the concealment or destruction of evidence.'") (quoting *New York v. Belton*, 453 U.S. 454, 457 (1981)).  Based on the foregoing, the undersigned finds the seizure of the evidence and any subsequent statements made by Defendant to law enforcement officers did not violate the Fourth Amendment.

## IV.    Conclusion

The undersigned finds the warrantless entry by detectives into Room 118 to be lawful, as exigent circumstances existed for the detectives to gain entry into the room.  Once lawfully inside the room, the detectives had probable cause to seize the firearm and other evidence in plain view.  The drugs and drug contraband within Room 118 were also properly seized incident to the Defendant's arrest.  Therefore, Defendant's argument that the detectives violated his rights under the Fourth Amendment must fail.

Accordingly, it is respectfully

**RECOMMENDED**:

Defendant's Motion to Suppress (Doc. 18) be **DENIED**.

**DONE AND ENTERED** at Jacksonville, Florida, on June 18, 2015.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

The Honorable Marcia Morales Howard
United States District Judge

Counsel of Record