**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

v.                                                    Case No.  3:15-cr-45-J-34MCR

DARRYL THORNTON SHINGLES
_____

## O R D E R

**THIS CAUSE** is before the Court on Defendant Darryl Thornton Shingles' Motion to

Suppress Physical Evidence and Statements and Memorandum of Law (Doc. 18; Motion),

filed on May 5, 2015.  The Government filed a response in opposition to the Motion on May

19, 2015, see United States' Response to Defendant's Motion to Suppress Physical

Evidence and Statements (Doc. 25; Response).  The Motion was referred to the Honorable

Monte C. Richardson, United States Magistrate Judge, to conduct an evidentiary hearing and

recommend an appropriate resolution.  Accordingly, Magistrate Judge Richardson held an

evidentiary hearing on May 27, 2015, see Minute Entry (Doc. 30).  On June 18, 2015, he

entered a Report and Recommendation (Doc. 37; Report).  Thereafter, Defendant filed

objections to the Report, see Objections to Report and Recommendations (Doc. 40;

Objections), and the Government responded, see United States' Response to Defendant's

Objections to the Report and Recommendation (Doc. 41; Response to Objections).  As such,

this matter is ripe for review.

-1-

## I.     Standard of Review

The Court reviews a magistrate judge's report and recommendation in accordance with the requirements of Rule 59, Federal Rules of Criminal Procedure (Rule(s)) and 28 U.S.C. § 636(b)(1).  The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1); see also Rule 59(b)(3).  "[I]n determining whether to accept, reject, or modify the magistrate's report and recommendations, the district court has the duty to conduct a careful and complete review." Williams v. Wainwright, 681 F.2d 732, 732 (11th Cir. 1982) (quoting Nettles v. Wainwright, 677 F.2d 404, 408 (5th Cir. Unit B 1982)[1]).  Additionally, pursuant to Rule 59 and § 636(b)(1), where a party timely objects[2] to the magistrate judge's report and recommendation, "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1);  see also  Rule 59(b)(3);  Thomas v. Arn, 474 U.S. 140, 149-50 (1985). Nevertheless, while de novo review of a magistrate judge's recommendation is required only

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent decisions of the former Fifth Circuit (including Unit A panel decisions of that circuit) handed down prior to October 1, 1981.  W.R. Huff Asset Mgmt. Co., L.L.C. v. Kohlberg, Kravis, Roberts & Co., L.P., 566 F.3d 979, 985 n.6 (11th Cir. 2009).  After October 1, 1981, "only the decisions of the continuing Fifth Circuit's Administrative Unit B are binding on this circuit. . . ."  Dresdner Bank AG v. M/V Olympia Voyager, 446 F.3d 1377, 1381 n.1 (11th Cir. 2006).  The Court notes that the Fifth Circuit overruled Nettles, in part, on other grounds, in Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc). However, "that does not change the binding effect of Nettles in this Circuit because Douglass was decided after October 1, 1981, and was not a Unit B decision."  United States v. Schultz, 565 F.3d 1353, 1360 n.4 (11th Cir. 2009).

[2] Both 28 U.S.C. § 636(b)(1) and Rule 59(b)(2) require a party wishing to object to a magistrate judge's recommendation to serve and file any objections within fourteen (14) days of being served with the magistrate's recommendation.  Rule 59 further provides that a "[f]ailure to object in accordance with this rule waives a party's right to review."  Rule 59(b)(2).

where an objection is made[3], the Court always retains the authority to review such a recommendation in the exercise of its discretion.  <u>See</u> Rule 59 advisory committee notes (2005) (citing <u>Thomas</u>, 474 U.S. at 154; <u>Mathews v. Weber</u>, 423 U.S. 261, 270-71 (1976)).

In deciding whether to reject or accept the magistrate judge's recommendations, a district judge retains the power "to hear additional testimony or the same testimony all over again if [she decides] that [it] would be beneficial in determining the motion."  <u>United States v. Marshall</u>, 609 F.2d 152, 154 (5th Cir. 1980) (alteration added); <u>United States v. Raddatz</u>, 447 U.S. 667, 680 (1980) ("[A district judge's] broad discretion includes hearing the witnesses live to resolve conflicting credibility claims."); <u>see also</u> <u>Amlong & Amlong, P.A. v. Denny's, Inc.</u>, 500 F.3d 1230, 1251 (11th Cir. 2007) ("[T]he district court may, if it so chooses, conduct its own hearing as a prelude to making a new determination.").  However, if a district court elects to reject a magistrate judge's credibility determinations on critical fact issues, the court must first rehear the disputed testimony.  <u>Louis v. Blackburn</u>, 630 F.2d 1105, 1110 (5th Cir. 1980)[4]; <u>United States v. Cofield</u>, 272 F.3d 1303, 1306 (11th Cir. 2001) (per curiam); <u>see also</u> <u>Amlong & Amlong, P.A.</u>, 500 F.3d at 1250 ("[A] district court may not override essential, demeanor-intensive fact finding by a magistrate judge without hearing the evidence itself or citing an exceptional justification for discarding the magistrate judge's

---

[3] <u>See</u> Rule 59 advisory committee notes (2005) (citing <u>Peretz v. United States</u>, 501 U.S. 923 (1991)).

[4] In <u>Ballard v. Comm'r of Internal Revenue</u>, 429 F.3d 1026 (11th Cir. 2005) (per curiam), the Eleventh Circuit states that "[a] district court must defer to a magistrate's findings unless the magistrate's understanding of facts is entirely unreasonable."  <u>Ballard</u>, 429 F.3d at 1031.  To the extent <u>Ballard</u> conflicts with <u>Blackburn</u> and <u>Marshall</u>, the Court notes that "where two prior panel decisions conflict" the Court is "bound to follow the oldest one."  <u>Cohen v. Office Depot, Inc.</u>, 204 F.3d 1069, 1072 (11th Cir. 2000).  Regardless, the Court need not resolve this conflict because the undersigned will accept the Magistrate Judge's credibility determinations. As set forth below, the Court can discern no basis in the record to doubt the Magistrate Judge's findings, much less to suggest that the findings are "entirely unreasonable."

findings.").  Indeed, only in the "rare case" where "'there . . . [is] found in the transcript an articulable basis for rejecting the magistrate's original resolution of credibility and that basis . . . [is] articulated by the district judge'" may the district court reject the credibility findings without rehearing the witness testimony.  Cofield, 272 F.3d at 1306 (quoting Marshall, 609 F.2d at 155); Amlong & Amlong, P.A., 500 F.3d at 1250.  In contrast, "a district court is not required to rehear witness testimony when accepting a magistrate judge's credibility findings."  Cofield, 272 F.3d at 1305 (emphasis added) (citing Raddatz, 447 U.S. 667, 675-76).

**II.     Defendant's Objections**

        Defendant raises two objections to the Report.  Defendant's first objection is to a factual finding of the Magistrate Judge.  See Objections at 2-5.  Defendant's second objection is to a legal finding of the Magistrate Judge and is contingent on the Court sustaining his first objection.  Id. at 5-7.  Accordingly, in order to provide sufficient context to address these objections, the Court will begin its discussion with a recitation of the relevant background facts.

**A.     Defendant's first objection: Was it a knock or a push?**

        On the evening of June 21, 2014, Detective Charles Bennett with the Jacksonville Sheriff's Office ("JSO") and Detectives Cedric Arline and Brian Blackwell with the Nassau County Sheriff's Office ("NCSO") were assisting with Operation Cross Country, a nationwide human trafficking operation which placed an emphasis on rescuing victims of juvenile sex trafficking.  Hearing Transcript (Doc. 33; Tr.) at 8-9, 58, 60-62.  The three officers were

assigned to Philips Highway in Jacksonville, specifically the area north of Emerson Street, which Detective Bennett described as a "high-narcotics, high-prostitution area." Id. at 10-11.

Between 11:00 p.m. and 11:30 p.m., Detectives Bennett, Arline, and Blackwell had interaction with a supervisor, JSO Sergeant Jonathan LaDue. Id. at 11-12; 76-77. Sergeant LaDue had "received information from other detectives and the FBI that were working the case, that there may be a 15-year-old girl inside [Room 118 of the Eagle Inn motel] with another prostitute." Id. at 77. Sergeant LaDue flagged down Detective Bennett and told him to go Room 118 of the Eagle Inn because "[t]here's a 15-year-old girl prostitute down there." Id. at 12. Sergeant LaDue told Detective Bennett to go see "Precious," who would "tell [him] where the 15-year-old girl" was and also told him that the juvenile's nickname was "Pinky." Id. at 12-13. 63.[5] Detective Bennett testified that he is familiar with the Eagle Inn and that it is "known for narcotics and prostitution." Id. at 16. Similarly, Sergeant LaDue testified that he has "probably been involved in more than 1500 contacts with prostitutes within a quarter mile" of the Eagle Inn. Id. at 86.

After receiving the information from Sergeant LaDue, Detectives Bennett, Arline, and Blackwell proceeded to the Eagle Inn. Id. at 12, 63. As he approached the room, Detective Bennett could hear at least two male voices coming from the motel room and could tell that

---

[5] Detective Arline similarly testified that around 11:00 p.m. or 11:30 p.m., Sergeant LaDue told him and Detectives Bennett and Blackwell "about a 15-year-old female being prostituted out of one of the motels there on Philips Highway" and asked them to "proceed over there to" Room 118 to "see if [they could] make contact with her." Tr. at 62-63. Detective Arline further testified that the juvenile had a "street name" of "Pinky." Id. at 63.

Sergeant LaDue's testimony was largely the same. He testified that he "relate[d] to [Detective Bennett] that there had been credible information about a juvenile named Pinky that was supposedly at" the Eagle Inn "with another woman named Precious[.] Id. at 86.

the door was unlatched and "slightly ajar", "open about an inch . . . to two inches." Id. at 14-

15, 22, 28.  Detective Arline testified similarly that as they approached the door, he could see

that the door was ajar and could hear male and female voices.  Id. at 63, 68.  Defendant's

first objection centers on the Magistrate Judge's factual findings regarding the events which

transpired next.  Specifically, the Magistrate Judge determined:

> Detective Bennett used his right hand to knock twice on the door with a "heavy
> knock" and stated "Police" in a tone somewhere between conversational and
> yelling. (Tr. 20-22.) Because the door was slightly ajar, the door opened from
> about one inch to "probably half a foot on the first knock." (Tr. 22.) After
> Detective Bennett's second knock, the door "opened probably another six
> inches to a foot." Id. At that time, Detective Bennett saw a table at the edge of
> the doorway. (Tr. 23.) On the table, Detective Bennett observed in plain view
> a beaker turned upside down on the table. (Tr. 23.) Based on Detective
> Bennett's training with narcotics, he observed what appeared to him to be crack
> cocaine "cooling" inside of a beaker. (Tr. 23, 36, 37, 56, Govt. Ex. 8-9.)
> 　　　Detective Bennett then used his left hand to push the door to Room 118
> completely open. (Tr. 23.)  .  .  .
> 　　　Detective Bennett, along with Detectives Arline and Blackwell then
> entered the room. (Tr. 25, 29.)

Report at 5.  Defendant objects to the Magistrate Judge's factual finding "that Detective

Bennett's actions constituted a knock, followed by an inadvertent glimpse inside the hotel

room."  Objections at 2.  Defendant asserts that the Magistrate Judge's factual determination

does not adequately reflect Detective Bennett's testimony in light of Detective Bennett's

concession on cross examination "that the whole process of knocking and pushing was a very

'fluid' motion" and his testimony in response to the Magistrate Judge's questions that he "was

going to try to get into that room" and that he "was going to do everything [he] could to look

in that room."  Id. at 3-4.  According to Defendant, these admissions dictate the conclusion

that Detective Bennett "arrive[d] at the room and push[ed] the door open with the intent to

gain entry into the room", which would, in turn, dictate the legal finding that the officers' entry into the motel room cannot be justified on the basis that they were able to see narcotics and narcotics paraphernalia in plain view. Id. at 4-5.

In response, the Government argues that the Magistrate Judge's findings of fact on this issue are "well-supported by the transcript" and are "well-supported by a common-sense interpretation of what actually happened." Response to Objections at 2. The Government notes that Detective Arline's testimony corroborates Detective Bennet's testimony and further asserts that "[t]he Magistrate Judge credited the accounts of two separate investigators (from two separate agencies) and did not credit the account of a twenty-one (21) time convicted felon." Id.

However, the Government's response does not address the precise argument which Defendant makes in support of his first objection. Defendant does not argue that the Magistrate Judge should have credited his own testimony over the officers' testimony. Rather, Defendant argues that the Magistrate Judge's characterization of the facts "ignore[d]" portions of Detective Bennett's testimony which support the conclusion that Detective Bennett pushed the door open rather than the finding that the door swung open when Detective Bennett knocked. On direct examination and cross examination, Detective Bennett's testimony was largely consistent. On direct examination, Detective Bennett testified that when he knocked on the door the first time, he said "Police", and the door opened approximately six inches. Tr. at 21-22. He further testified that when he knocked the second time, the door "opened probably another six inches to a foot", and as "the door began to open", he saw the beaker on the table by the door. Id. at 22-23. Detective Bennett explained

that when the door swung open wide enough for him to see Defendant and a woman sitting by the bed, he "used [his] left hand to push the door completely open[.]" Id. at 23.  When asked to explain the chronology, Detective Bennett testified, "So as it's opening, it's happening very fast.  But I see the beaker.  It opens.  I see a gentleman sitting on the floor, woman on the bed, and then gentleman's legs at the chair.  And it all happened that fast." Id. at 24.

On cross examination, Detective Bennett testified similarly that the door "opened six inches to a foot on the first knock" and that  "[t]he second knock would've been the same distance."  Id. at 35.  He further testified that "[a]t that time, as I'm starting to see into the room, I used my left hand to push the door all the way open."  Id.  The testimony on cross-examination continued as follows:

> Q.    So we're clear, the first knock, six to twelve inches, you still couldn't see what was in the room?
> A.    Yes.
> Q.    The second knock, another six to twelve inches, still could not see what was in the room?
> A.    Are you talking about people, or when did I see the cocaine on the table?
> Q.    Could you see anything the second knock?
> A.    Yes, sir. Because the door was open, we saw the cocaine. And the door was pushed open, and then I went to see the people in the room, yes, sir.
> Q.    So you're saying it was the second knock that allowed you to see the cocaine?
> A.    Tell you - - it happened so fast, and I'm telling you one to two feet.  But as that door opened and I saw cocaine, I knew I had to push the door all the way open to see the people in the room.  Now I'm concerned with officer safety; I'm taking control of that room.
> Q.    Okay. But just - - what I'm trying to get clear for the judge here is it was - - the first knock of six to twelve inches did not allow you to see the cocaine; correct?

A.    Honestly, I couldn't tell you.  I know that, as the door opened, I saw it.  So as my eyes are up - - because I'm not looking for cocaine; I'm looking for bodies in that room.  That beaker of cocaine can't kill me or those two Nassau County detectives; the unknowns in that room can kill all of us.

So I'm trying to explain to you like this.  I want to get a look at that point, as the door is coming up, to see what my threats in that room are.  I don't want anybody to get hurt.  I don't want me and my partners to get hurt.  I don't want anybody in the room to get hurt.  As the door opens, I can see that there.

So I'm - - I think I'm getting confused here, and I apologize.  But you're trying to break me down step by step where it was, and it was a fluid motion.  As we sit here and talk about it, I'm taking you step to step.  And that was all fluid when I said, "I'm going to knock on the door."  I'm knocking: "Police."  The door's opening.  I see the cocaine.  I see legs.  I see the defendant.  I see the lady.  And outside of that, I'm having a hard time breaking it down frame by frame.

Q.    Okay.  And that's fair.  And that's what I am getting at. This happened very quickly; correct?

A.    Yes, sir.

Q.    And, like you said, it was - - what we know is there were two knocks and then there was a push with the left hand to open the door?

A.    Yes, sir.

Q.    And it was all one very fluid motion; correct?

A.    Yes, sir.

Tr. at 36-38.

Additionally, towards the end of Detective Bennett's testimony, the Magistrate Judge asked Detective Bennett, "[A]t what point did you decide to enter that room?", to which Detective Bennett replied,

. . . I was going to try to get in that room to make sure they weren't hiding a 15-year-old girl in there.  It's no different than when I go to a unverified 9-1-1 call as a patrolman.
. . .
Husband comes to the door and is like, 'No, everything's fine here,' we still make our way into the house to make sure there's not somebody else in the house; so we're actually talking to people.

So I was going to do everything I could to look in that room to make sure there was not a juvenile in there being prostituted.  The only thing that changed

-9-

the game for me, Your Honor, was when we saw that beaker, because then I went from just recovering a 15-year-old girl to I had another situation I was going to have to deal with in that room.

Id. at 55-56.  The Magistrate Judge also asked for further clarification regarding Detective

Bennett's knocks on the door:

| | |
|---|---|
| THE COURT: | And the beaker was the first thing you saw? |
| THE WITNESS: | Yes, sir. |
| THE COURT: | And that was after the first or second knock? |
| THE WITNESS: | Yes, sir. |
| THE COURT: | So you saw the beaker, and then eventually you saw people? |
| THE WITNESS: | Yes, sir. |

Id. at 56.

Here, Detective Bennett's admission that the two knocks followed by a push was "all

one very fluid motion" does not negate his testimony that it was his knocking on the door

which caused the door to open wide enough for him to see the contraband which, in turn,

provided probable cause to enter the room.  It is common sense that the process of knocking

on an unlatched, ajar door, viewing inside the door, and then pushing the door open in order

to enter, would be a fluid one which would happen quickly.  Indeed, an action can be fluid yet

still be comprised of discrete movements or actions.  Moreover, the Magistrate Judge's own

line of questioning confirms the finding that Detective Bennett's knocking caused the door to

open.  See Tr. at 56.  Additionally, Detective Bennett's testimony that he "was going to try to

get in that room to make sure they weren't hiding a 15-year-old girl in there" and that he "was

going to do everything [he] could to look in that room to make sure there was not a juvenile

in there being prostituted" does not dictate the conclusion that Detective Bennett forced the

door open in order to gain entry.  While Detective Bennett's motivation for approaching Room

-10-

118 was certainly to make contact with a juvenile sex trafficking victim, the facts as established at the hearing confirm that Detective Bennett entered the room only upon seeing illegal contraband in plain view.   In sum, the Report reflects that the Magistrate Judge weighed the testimony of the witnesses, taking into account the interests of the witnesses, considering the consistencies and inconsistencies of their testimony, and relying on Detective Bennett's well-supported version of events.   After de novo review of the transcripts and evidence in this case, the Court will accept the credibility determinations made by the Magistrate Judge.   Indeed, the Court finds nothing in the Objections that undermines its confidence in the findings of the Magistrate Judge, and further concludes that these findings are entirely reasonable and fully supported by the record.   Thus, the Court declines to hold an additional evidentiary hearing and will accept the credibility determinations of the Magistrate Judge and the factual findings that flow from those credibility determinations.

> **B.    Defendant's second objection: Did exigent circumstances allow a warrantless entry?**

Defendant's second objection is contingent on the Court sustaining his first objection. Specifically, Defendant argues that upon finding that Detective Bennett forced the door open, the Magistrate Judge's determination - that the officers' warrantless entry was justified because the officers saw the beaker with crack cocaine on the table inside the room - can no longer stand.   Objections at 5-7.   Instead, Defendant argues that the "Court must then turn the analysis to whether exigent circumstances existed which would have allowed a warrantless, forced entry into the room" based on the potential need to assist a minor at risk of sexual exploitation.   Id. at 5.   As to this issue, Defendant argues that two factors dictate that

this particular exigency does not apply.  First, Defendant asserts that "the record is not clear as to who the individual who gave the initial tip to officers was, nor was there any evidence presented by the [G]overnment as to the credibility of that individual or whether they had ever been used in the past to provide information." Id.  Second, Defendant asserts that "[t]he fact that the exterior door [to the motel room] was not fully shut, but rather, left unlatched, is inconsistent with the assumption that prostitution may be going on inside." Id. at 6.

In response, the Government relies upon its briefing in its Response to the Motion and argues that "if the law permits officers to enter a hotel room to prevent the destruction of drugs, the law has to permit entry to prevent the sexual assault, or potential sexual assault, of a child."  Response to Objections at 3.  The Government further argues that Defendant's objection overlooks an additional exigency present in the case - that the officers had a "reasonable belief about the imminent destruction of narcotics once the officer's presence was known by the room occupants." Id.

"'It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" United States v. Burgos, 720 F.2d 1520, 1525 (11th Cir. 1983) (quoting Payton v. New York, 445 U.S. 573, 586 (1980)) (internal quotation marks omitted); see also United States v. Tovar-Rico, 61 F.3d 1529, 1534 (11th Cir. 1995) ("A warrantless entry of a person's home is presumptively unreasonable.").  However, the Supreme Court "has recognized that circumstances sometimes preclude the obtaining of a warrant and therefore has allowed warrantless searches and seizures of a residence where both probable cause and exigent circumstances exist." Burgos, 720 F.2d at 1525.  "For example, a warrantless search is justified where both probable cause and exigent

circumstances exist." Hardy v. Broward Cnty. Sheriff's Office, 238 F. App'x 435, 441 (11th Cir. 2007); see also Burgos, 720 F.2d at 1525 ("A warrantless entry, however, must be justified not only by probable cause but also by exigent circumstances.").

"'Probable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Magluta, 418 F.3d 1166, 1182 (11th Cir. 2005) (quoting United States v. Goddard, 312 F.3d 1360, 1363 (11th Cir. 2002)) (inner quotation marks omitted).  Further, "[t]he term 'exigent circumstances' refers to a situation where the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." Burgos, 720 F.2d at 1526.  The Eleventh Circuit Court of Appeals "has held that the 'presence of contraband without more does not give rise to exigent circumstances.'" United States v. Tobin, 923 F.2d 1506, 1510 (11th Cir. 1991).  "Exigent circumstances that have been recognized include: danger of flight or escape; danger of harm to police officers or the general public; risk of loss, destruction, removal, or concealment of evidence; and 'hot pursuit' of a fleeing suspect." United States v. Blasco, 702 F.2d 1315, 1325 (11th Cir. 1983).  Additionally, the Supreme Court has recognized that another "exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006).  More specifically, courts have recognized that the potential need to assist a minor at risk for sexual exploitation can justify the warrantless entry of a home.  See United States v. Kenfield, 270 F. App'x 695, 696-67 (9th Cir. 2008) (exigent circumstances exception extends to situations where a minor is at risk of sexual contact); United States v. Williams, No. 12-CR-6152-FPG, 2015 WL 3454430, at *4 (W.D.N.Y.

May 29, 2015) (upholding warrantless search of apartment due to officers' reasonable belief that it was necessary to enter apartment in order to render emergency aid to minor being held against her will for prostitution). "The government has the burden of proof of showing exigent circumstances." Tovar-Rico, 61 F.3d at 1535.

Preliminarily, the Court reaffirms the fundamental principle that an individual's residence, whether a house, apartment, or motel room, is entitled to the highest protection from governmental intrusion. United States v. Ramos, 12 F.3d 1019, 1023 (11th Cir. 1994) ("Use of a motel room for lodging provides the same expectation of privacy as does a home."). The facts as established at the suppression hearing show that Detectives Bennett and Arline were justified in approaching Room 118 of the Eagle Inn and knocking on the door based on information that a juvenile trafficking victim was potentially located inside the room. See United States v. Smalls, 617 F. Supp. 2d 1240, 1252 (S.D. Fla. 2008) ("It is well-settled that the police may approach a residence and knock on the door for any legitimate reason.") (citing United States v. Taylor, 458 F.3d 1201, 1204 (11th Cir. 2006)). The Court has further determined that after either Detective Bennett's first or second knock, the motel room door opened wide enough for the officers to see the beaker containing crack cocaine in plain view. At that point, the officers had probable cause to believe that a search of the room would uncover evidence of a crime. See Tobin, 923 F.2d at 1510 ("[P]robable cause exists 'where the facts lead a reasonably cautious person to believe that the search will uncover evidence of a crime.'"). Additionally, exigent circumstances existed to enter the motel room because the officers had a reasonable basis to believe that the drugs and drug paraphernalia might be destroyed before a warrant could be secured. See Hardy, 238 F. App'x at 441-42.

Because these facts justify the officers' warrantless entry, the Court could overrule Defendant's second objection on that basis alone.  However, for purposes of a complete record, the Court will consider Defendant's specific objection.

In support of his second objection, Defendant characterizes the Report as follows: "The R&R suggests . . . that even if [Detective] Bennett did force the door open in the manner in which the defense argues, that it would be irrelevant because he would have been justified in doing so because the investigation into a potential underage prostitute would constitute exigent circumstances." Objections at 5.  Indeed, the Magistrate Judge determined that "[t]he potential need to assist a minor at risk for sexual exploitation provided an additional exigency to enter the room."  Report at 17.  More specifically, the Magistrate Judge determined:

> Defendant did not contest the validity of the specific information that the detectives received regarding the potential at-risk juvenile.  Armed with the information that a fifteen (15) year-old female known as "Pinky" may be the victim of sex trafficking in Room 118, as well as knowledge of the hotel's reputation, Detectives Bennett and Arline approached a slightly opened hotel door, hearing mixed male and female voices inside the room.  The undersigned finds that it was objectively reasonable for the detectives to believe there was an urgent need to investigate, knock, and enter a hotel room to potentially retrieve a minor at risk for sexual exploitation or trafficking.

Id. at 18.  Thus, the Magistrate Judge's determination does not evaluate the credibility or reliability of the information on which the officers relied.  However, the Magistrate Judge also does not make a finding that the officers had probable cause to believe that a minor was being sexually exploited in the hotel room.  See id. at 13-15.  Instead, the Magistrate Judge's determination is limited to the finding that the information the officers possessed regarding the minor constituted an "additional exigency" under the circumstances of this case.  Id. at 17. As such, the Court understands the Report to make the common sense conclusion that

although the drugs and drug paraphernalia justified the warrantless entry, the officers' original motivation for investigating the Eagle Inn - to potentially retrieve a minor at risk of sexual exploitation - constituted an additional exigency under the totality of the circumstances. Accordingly, the ambiguity in the record regarding the information on which the officers relied does not undermine the Magistrate Judge's findings.

Additionally, the fact that the door was cracked open an inch or two and that the officers did not hear noise emanating from the room "to suggest that violence or sexual activity was occurring inside the room", Objections at 6, does not dictate that the officers lacked a sufficient basis to believe a minor was potentially being exploited inside the room. Defendant argues that "[c]ommon sense would dictate that if individuals were in fact engaging in prostitution, especially prostitution with an underage girl, they would shut the door fully and not leave an exterior door into the room unlatched and available for anybody to walk into the room." Id. at 6. If the Court applied Defendant's logic to the rest of this case, then common sense would also dictate that the occupants of the room would not leave the door unlatched with drugs and drug paraphernalia in open view. Put simply, the Court finds this argument unpersuasive.

Accordingly, the Court will overrule Defendant's Objections, adopt the Magistrate Judge's Report, and deny the Motion. In accordance with the foregoing, it is

**ORDERED:**

1.    Defendant's Objections to Report and Recommendation (Doc. 40) is **OVERRULED**.

2.      The Magistrate Judge's recommended resolution in the Report and Recommendation (Doc. 37) is **ADOPTED** as set forth in the body of this Order.

3.      Defendant's Motion to Suppress Physical Evidence and Statements and Memorandum of Law (Doc. 18) is **DENIED**.

**DONE AND ORDERED** at Jacksonville, Florida, this 6th day of October, 2015.

**MARCIA MORALES HOWARD**
United States District Judge

lc18
Copies to:

Hon. Monte C. Richardson
Counsel of Record